**SIGNED THIS: November 20, 2012**

_____
**Thomas L. Perkins**
**United States Chief Bankruptcy Judge**
_____

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CENTRAL ILLINOIS ENERGY, L.L.C., | ) | Case No.  07-82817 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| GARY T. RAFOOL, not individually but | ) | |
| as Trustee for the estate of Central Illinois | ) | |
| Energy, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No.  10-8026 |
| | ) | |
| MICHAEL E. EVANS and FROEHLING, | ) | |
| WEBER & SCHELL, LLP, formerly doing | ) | |
| business as FROEHLING, WEBER, EVANS | ) | |
| & SCHELL, LLP, | ) | |
| | ) | |
| Defendants. | ) | |

## O P I N I O N

This matter is before the Court on the motion for summary judgment filed by the

Defendants, Michael E. Evans and Froehling, Weber & Schell, LLP, on the complaint filed

by Gary T. Rafool, as Trustee for the estate of Central Illinois Energy, L.L.C., for legal

malpractice.

*BACKGROUND*

The Debtor, Central Illinois Energy, L.L.C. (Debtor), was formed in 2004 for the

purpose of constructing, owning and operating an ethanol production facility, including

a waste-coal fired co-generation facility.  In 2005, the Debtor and Lurgi PSI, Inc. (Lurgi),

entered into an Engineering, Procurement and Construction Agreement (EPC Agreement),

pursuant to which Lurgi agreed to design and construct the ethanol facility.  Later, in

August of 2005, the parties entered into a second EPC Agreement for the design,

engineering and construction of a combined heat and power plant to power the ethanol

facility. The EPC Agreements also provided intellectual property (IP) licenses to the Debtor

for the use of Lurgi's intellectual property that was used in the project.  Pursuant to the

EPC Agreements, the Debtor was obligated to make monthly progress payments for the

work completed and equipment procured.  As is customary in the construction industry,

the EPC Agreements provided for a percentage of each progress payment to be withheld

by the Debtor as retainage.  Those EPC Agreements allowed Lurgi, at its option, to provide

letters of credit for the benefit of the Debtor in lieu of that retainage.  Michael Evans, along

with attorneys from another law firm, represented the Debtor in the negotiations resulting

in those EPC Agreements.

In April, 2006, the Debtor entered into a credit agreement with Credit Suisse, as

agent for itself and a consortium of other lenders, for a construction loan of up to

$87,500,000, secured by liens on substantially all of the Debtor's assets.  The law firm of

Sidley Austin LLP was employed by the Debtor as additional counsel to assist in the negotiation, documentation and administration of the construction loan.

On July 13, 2006, Lurgi posted an irrevocable standby letter of credit in the amount of $2,525,000 from DZ Bank AG. In January, 2007, the amount of the letter of credit was increased to $4,645,000. On August 7, 2006, Lurgi obtained an additional irrevocable standby letter of credit from Commerzbank in the amount of $3,135,000. The expiration date of both letters of credit was December 15, 2007, although the letters of credit were automatically renewable for one year periods unless the respective banks received notice from the Debtor, as beneficiary, along with the letter of credit, instructing the issuing bank to terminate the letter of credit, or unless the issuing bank had sent notice to the Debtor of at least 30 days, but no more than 45 days, that the letter of credit would not be extended. Both letters of credit provided that if the letter of credit was not extended beyond the expiration date and was not renewed or replaced by Lurgi, the Debtor could make a draw within the last fifteen days prior to the current expiration date.

Construction began in May, 2005. By early 2007, the Debtor encountered financial difficulties as a result of a series of delays and cost overruns. Disputes arose between the Debtor and Lurgi. The Debtor's troubles came to a head in the late fall of 2007. Considering the Debtor to be in default, Lurgi filed mechanics lien claims and commenced arbitration proceedings against the Debtor. Other subcontractors followed suit and construction was halted. Evans met with Barry Barash, a bankruptcy attorney, to discuss the Debtor's deteriorating financial condition. During that final week of November, Evans maintained close contacts with Sidley Austin, Barash, Mike Smith, the Debtor's General

Manager, and the members of the Debtor's board of directors. On November 28, 2007, Lurgi purportedly delivered termination notices on each of the EPC Agreements.[1]

On November 30, 2007, the Debtor notified Lurgi of its intent to draw on the letters of credit issued by DZ Bank and Commerzbank, based upon Lurgi's wrongful termination of the EPC Agreements. By separate letters on that same date, the Debtor notified Lurgi of its intent to draw upon both letters of credit for the alternative reason that neither had been extended beyond the original expiration date of December 15, 2007. On that same date, November 30, 2007, Lurgi caused two new irrevocable standby letters of credit to be issued by Calyon Credit Agricole CIB (Calyon) in the amounts of $4,465,000 and $4,238,000.[2] The new letters of credit contained an expiration date of December 15, 2008.

On December 8, 2007, the Debtor's board of directors terminated Sidley Austin's representation and authorized the hiring of Barry Barash for the purpose of representing the Debtor in a chapter 11 bankruptcy proceeding. On that same day, Mike Smith resigned as the Debtor's General Manager. The Debtor filed a chapter 7 petition on December 13, 2007. On January 7, 2008, the Debtor, through Barash, filed an expedited motion for secured postpetition financing that refers to the Calyon letters of credit and proposes to correct the bank account information included on those letters of credit, which motion was subsequently denied for reasons unrelated to the letters of credit. After efforts to find a private buyer for the facilities proved fruitless, the Debtor filed on February 5, 2008, a

---

[1]The Trustee disputes this as lacking an evidentiary basis in the record. The termination notices are not part of the record. However, to the extent that a wrongful termination by Lurgi would have provided grounds for the Debtor to draw on the letters of credit, the fact of termination is favorable to the Trustee.

[2]Although the Trustee disputes this fact, he regards it as "immaterial" whether the letters of credit at issue are the Calyon letters of credit or the DZ Bank and Commerzbank letters of credit.

4

motion to sell its assets at auction, to establish procedures for the sale and for the assumption and assignment to the purchaser of certain executory contracts and leases. The Debtor negotiated an agreement with a consortium of its prepetition secured lenders for the purchase of its assets through a credit bid, with the assets to remain subject to perfected mechanics lien claims.   Lurgi, among others, objected to the sale on several grounds, including that the EPC Agreements had been terminated prior to the filing of the petition. After a hearing, an order was entered finding that the sale was in the best interests of the Debtor and its creditors and approving procedures for the sale, assumption of executory contracts and leases, and resolution of mechanics lien claims.

The order directed the Debtor to identify the executory contracts which it intended to assume and to notify the counterparties to those contracts by March 20, 2008.  On that date, the Debtor filed a list of executory contracts which it intended to assume, specifically reserving the right to seek to assume or reject additional contracts in the future.  Neither the EPC Agreements nor the letters of credit were on that list or on an amended list filed by the Debtor on April 8, 2008.  One day earlier, Credit Suisse filed an unsigned, but "near final" Asset Purchase Agreement (APA) between the Debtor and New CIE Energy, LLC (New CIE), the limited liability company formed by the prepetition secured lenders.  The APA defined the assets which were being sold to New CIE as essentially all of the Debtor's rights in property of every kind, except for assets which were specifically identified as being excluded.  The APA further defined "assumed executory contracts" to mean all of the Debtor's executory contracts with the exception of those listed on the schedule of excluded executory contracts.   The Benchmark & Tech Support Consulting Services

Agreement was the only Lurgi contract which was listed on the schedule of contracts which were not to be assumed by the Debtor.  No letter of credit was included on the list of excluded executory contracts.

Lurgi, clarifying its objection to the sale, contended that although the Debtor had not formally sought to assume the letters of credit, approval of the proposed APA and the order approving the sale would effect an assumption and assignment of the letters of credit to the purchaser.  In response to Lurgi's objection to the impending sale, the Debtor asserted that the Debtor and the purchaser would comply with the license assignment provisions of the EPC Agreements in order that the EPC Agreements could be transferred to New CIE.  Lurgi argued that the letters of credit were independent from the EPC Agreements and were executory contracts to make a financial accommodation that could not be assumed and assigned by the Debtor.  On April 24, 2008, the Court entered an order approving the sale, which provided as follows with regard to the EPC Agreements and the letters of credit:

> 17.   Any rights granted to the Debtor pursuant to any letters of credit granted under any contract or agreement including, but not limited to, the EPC Agreements, shall continue to be governed by the terms and conditions of any such contract or agreement, or other applicable law, and, in the event any such assignment to Purchaser pursuant to further order of this Court or agreement amongst the parties, the Purchaser hereby agrees to comply with the applicable terms and conditions of any such contract or agreement.

> 18.   Until entry of a further order of this Court, after a hearing on the merits, or stipulation of the parties, the EPC Agreements shall not be Assumed Executory Contracts, Assumed Executory Leases, or Acquired Assets.  All rights, claims, arguments or defenses of the Debtor, Purchaser, or Lurgi, Inc. related to (a) the assumption or assignment of such EPC Agreements as Executory Contracts pursuant to section 365 of the Bankruptcy Code, or (b) the transfer of the EPC Agreements as Acquired Assets pursuant to section 363 of the Bankruptcy Code, are hereby reserved

pending such further order.  Debtor's failure to comply with the assumption and assignment procedures in the Sale Procedures Order with respect to the EPC Agreements shall not constitute a defense to, or a prohibition against, the assumption and assignment of any such agreement.

Lurgi and New CIE submitted their dispute to mediation, which proceeded throughout the summer.  On August 4, 2008, the case was converted to chapter 7.  Soon thereafter, Lurgi and New CIE reached a resolution.  On September 15, 2008, the chapter 7 Trustee, Lurgi, and New CIE filed a joint motion to compromise their disputes concerning the transferability of the EPC Agreements, the IP Licenses and the letters of credit.  Pursuant to the terms of their stipulation and mutual release of claims, the Trustee was to execute a release and return to Lurgi the letters of credit.  In addition, the APA was deemed amended to provide that the Debtor would have no obligation to sell or assign either the EPC Agreements or any of the related agreements.  The Stipulation and Mutual Release of Claims, attached as an exhibit to the joint motion, identifies the Calyon letters of credit as having been provided by Lurgi for the benefit of the Debtor in lieu of retainage.

An unsecured creditor objected to the compromise.  Upon review, the Court withheld approval based upon the form of the proposed order requiring the Trustee to release claims against Lurgi which were held by persons or entities other than the Debtor and the Debtor's bankruptcy estate, as clearly exceeding the Trustee's authority.  In response to that ruling, Lurgi withdrew all objections to the Debtor's motion to sell and requested that the Court reconsider its ruling denying the motion to approve the compromise.  Upon reconsideration, this Court, noting that Lurgi had been the sole objector to the assumption and assignment or acquisition of the EPC Agreements, ordered that the EPC Agreements, including the related letters of credit, became "Acquired Assets

with all rights and claims of the Debtor arising thereunder transferred and conveyed to the

Purchaser, to the extent of the Debtor's rights thereunder as may be limited by applicable

law including provisions of the Bankruptcy Code." The Trustee abandoned any interest

in the EPC Agreements, including the related letters of credit.

The Trustee brought this single-count complaint against the Defendants as "general

counsel" to the Debtor, alleging that they committed legal malpractice by failing to advise

or cause the Debtor to draw on the letters of credit prior to the bankruptcy filing and

seeking damages in the amount of the letters of credit, or $8,883,000. Alternatively, the

Trustee alleges, assuming the letters of credit were not contracts to extend financial

accommodations, that the Defendants committed legal malpractice by failing to call, or

cause the Debtor to call them prior to December 15, 2007.

### STANDARDS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), made applicable to adversary

proceedings in bankruptcy by Federal Rule of Bankruptcy Procedure 7056, summary

judgment is proper if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with any affidavits, show that there is no genuine issue of

material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the material

facts are not in dispute, the sole issue is whether the moving party is entitled to a judgment

as a matter of law. *ANR Advance Transp. Co. v. International Broth. of Teamsters, Local 710,*

153 F.3d 774, 777 (7th Cir. 1998). In order to prevail on a motion for summary judgment,

the moving party must establish there is no genuine issue of material fact as to any

essential element of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When a moving party has met its initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmovant to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial. Inferences to be drawn from underlying facts must be viewed in the light most favorable to parties opposing the motion. *In re Chambers*, 348 F.3d 650 (7th Cir. 2003). A material factual dispute is sufficient to prevent summary judgment only when the disputed fact is determinative of the outcome under applicable law. It is not the role of the trial court to weigh the evidence or to determine its credibility, and the moving party cannot prevail if any essential element of its claim for relief requires trial. *Anderson*, 477 U.S. at 249.

## OVERVIEW OF A LEGAL MALPRACTICE CLAIM

In order to establish a claim for malpractice, a plaintiff must establish (1) the existence of an attorney/client relationship; (2) a duty arising from that relationship; (3) a negligent act or omission on the part of the attorney; (4) causation; and (5) damages.[3] Because the duty owed by an attorney to a client arises out of a contractual relationship, the attorney's duty is measured by the scope of the contract of engagement. *F.D.I.C. v. Mahajan*, 2012 WL 3061852 (N.D.Ill. 2012). Thus, to establish a claim for legal malpractice premised upon an attorney's failure to properly advise a client, the plaintiff must establish that the scope of the representation included the advice that the defendant failed to give.

---

[3]The parties refer only to Illinois case law and accordingly, the court assumes that the malpractice claim is governed by Illinois law. Each of the four letters of credit contains a mandatory forum selection clause providing that the governing state law is that of New York. However, the Defendants are attorneys licensed to practice in Illinois who maintained, at the relevant time, an office in Canton, Illinois. The contract for legal services was, presumably, formed in Illinois and, by all evidence, performed in Illinois. However, the written contract for legal services, if there was one, between the Defendants and the Debtor is not part of the record.

*Dahlin v. Jenner & Block, L.L.C.*, 2001 WL 855419 (N.D.Ill. 2001). The duty of an attorney to his client is to exercise a reasonable degree of care and skill. *Stevens v. Walker*, 55 Ill. 151 (1870). An attorney is not liable for a mere error of judgment. *Dorf v. Relles*, 355 F.2d 488 (7th Cir. 1966). Expert testimony is ordinarily required to establish the applicable standard of care and whether an attorney breached the standard of care. *Barth v. Reagan*, 139 Ill.2d 399, 564 N.E.2d 1196 (1990). The exception to that rule is made for "grossly apparent negligence," which would be recognizable, without difficulty, by a layman. *First Nat. Bank of LaGrange v. Lowrey*, 375 Ill.App.3d 181, 872 N.E.2d 447 (Ill.App. 1 Dist. 2007). The issue of proximate causation in a legal malpractice action is generally considered a factual issue to be decided by the trier of fact, after consideration of all the evidence and attending circumstances. *Buckles v. Hopkins Goldenberg,* P.C., 2012 IL App (5th) 100432, 967 N.E.2d 458 (Ill.App. 5 Dist. 2012).

### *SUMMARY OF COMPLAINT AND MOTION*

Notwithstanding that the Complaint is pleaded as a single count, it asserts three separate and distinct causes of action. For purposes of addressing the motion for summary judgment, the Court must dissect the Complaint and identify the separate claims. *See Finizie v. Shineski,* 351 Fed.Appx. 668, 671 n.3 (3rd Cir. 2009); *Gevas v. McLaughlin,* 2012 WL 266942 (C.D.Ill. 2012).

One claim theorizes that the letters of credit are executory contracts to extend financial accommodations to the Debtor that may not be assumed or assigned by virtue of 11 U.S.C. § 365(c)(2), so that the letters of credit could no longer have been drawn upon once the Debtor filed its chapter 11 petition. The Trustee alleges that the Defendants owed

a duty to the Debtor to understand that and to advise the Debtor's board of directors to call
the letters of credit before bankruptcy. The allegations of breach of duty that form the basis
for this claim are made in paragraph 43, subparagraphs (a), (b) and (c) of the Complaint.

The second claim is pleaded in the alternative to the first claim, on the theory that
the letters of credit are not financial accommodations under section 365(c)(2). In that event,
the Trustee alleges that the Defendants breached their duty to the Debtor by failing "to call
upon, or cause the debtor in possession to call upon, the Letters of Credit prior to
December 15, 2007." This allegation is set forth in subparagraph (e) of paragraph 43 of the
Complaint.

For his third claim, the Trustee alleges that the Defendants "failed to advise Barash
of the existence of the letters of credit and the company's right to call upon them."
(Complaint par. 43(d)). Because this asserted breach of duty is, on the face of the allegation,
unrelated to and not dependent upon a particular resolution of the section 365(c)(2) issue,
it is properly treated as a separate cause of action. Defendants deny all alleged breaches
of duty. The Trustee alleges damages in the sum of $8,883,000, the face amount of the
Calyon letters of credit.

The motion for summary judgment first seeks a determination that the Debtor's
right to draw upon the letters of credit after bankruptcy was not barred by section 365(c)(2).
The Defendants contend that the Calyon letters of credit could have been drawn upon after
the bankruptcy filing so that the Trustee's initial theory, which depends upon an inability
to draw, fails because he cannot prove that the Defendants' acts or omissions were the
proximate cause of any harm to the Debtor. The Trustee's second claim depends upon a

finding that the December 15, 2007 termination date of the DZ Bank and Commerzbank letters remained meaningful despite the issuance of the Calyon letters.  If that date became meaningless because of the substitution of the Calyon letters, the Defendants argue in the motion, the Calyon letters could have been drawn upon thereafter and the Trustee cannot establish proximate cause.  Likewise, the third claim depends upon attorney Barash's unawareness of the letters of credit.  If he was aware of them, the Defendants contend proximate cause cannot be shown.

*NATURE OF A LETTER OF CREDIT AND THE INDEPENDENCE PRINCIPLE*

A letter of credit is regarded as a unique commercial instrument.  Letters of credit are governed by a specialized set of rules contained in Article 5 of the Uniform Commercial Code.  The Calyon letters of credit expressly incorporate the International Chamber of Commerce's Uniform Customs and Practice for Documentary Credits (UCP 600).  UCC Article 5, section 5-116(c), provides that "the liability of an issuer, nominated person, or adviser is governed by any rules of custom or practice, such as the Uniform Customs and Practice for Documentary Credits, to which the letter of credit, confirmation, or other undertaking is expressly made subject."  Section 5-102(a)(10) of the New York Uniform Commercial Code, defines a "letter of credit" to mean "a definite undertaking that satisfies the requirements of section 5-104 by an issuer to a beneficiary at the request or for the account of an applicant or, in the case of a financial institution, to itself or for its own account, to honor a documentary presentation by payment or delivery of an item of value."  NY UCC section 5-102(a)(10).

The issuance of a letter of credit entails three distinct relationships, two of which are

contractual.  First, there is the underlying agreement between the applicant for the letter of credit and the beneficiary.  A second contractual relationship arises between the issuer (usually a bank) and its applicant requiring reimbursement by the applicant for draws obtained by the beneficiary.  The third relationship arises from the issuance of the letter of credit to a designated beneficiary, formalizing the issuer's undertaking to honor a demand for payment by the beneficiary upon compliance with the terms and conditions specified therein.  *Nissho Iwai Europe PLC v. Korea First Bank*, 99 N.Y.2d 115, 782 N.E.2d 55 (N.Y. 2002).  The relationships between each pair of parties to the letter of credit transaction, characterized as  independent yet all required, have been likened to the "three legs of a tripod."  *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (Matter of  P.A. Bergner & Co.)*, 140 F.3d 1111, 1114 (7th Cir. 1998).

Generally, a "standby" letter of credit requires the beneficiary to present a document declaring only that the issuer's applicant has defaulted on some obligation, thereby triggering the beneficiary's right to draw down on the letter.  *Wood v. R.R. Donnelley & Sons Co.*, 888 F.2d 313, 317-18 (3rd Cir. 1989).  A beneficiary must strictly adhere to the conditions of the letter of credit and even slightly nonconforming documents will not satisfy the required standard of strict compliance.  *MSF Holding Ltd. v. Fiduciary Trust Co. Intern.*, 435 F.Supp.2d 285 (S.D.N.Y. 2006).  The obligation of the issuing bank to honor a conforming draft drawn on a letter of credit is absolute unless the documents are forged or fraudulent, or there is fraud in the transaction.  *Mennen v. J.P. Morgan & Co., Inc.*, 91 N.Y.2d 13, 689 N.E.2d 869 (N.Y. 1997); *see, also,* UCC § 5-109.  The issuer's payment obligation is unaffected by any disputes relating to the underlying commercial transaction

between the beneficiary and the applicant.   *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739 (2nd Cir. 1999).   The issuer must pay even if both the applicant and the beneficiary are insolvent, rendering it impossible to obtain reimbursement for the issuer's honor.   *Eakin v. Continental Illinois Nat. Bank & Trust Co. of Chicago,* 875 F.2d 114, 116-17 (7th Cir. 1989). The utility of a letter of credit is that the issuer's credit is substituted for that of the applicant.   *Nissho Iwai Europe,* 99 N.Y.2d at 119.

Fundamental to the letter of credit transaction is the principle that the issuing bank's obligation to honor draw demands by the beneficiary is separate and independent from the underlying contractual obligation of the applicant to the beneficiary, and separate as well from the applicant's reimbursement obligation.   *First Commercial Bank v. Gotham Originals, Inc.,* 64 N.Y.2d 287, 294, 475 N.E.2d 1255 (N.Y. 1985); *Rockwell Intern. Systems, Inc. v. Citibank, N.A.,* 719 F.2d 583, 587 (2nd Cir. 1983).   This independence principle means that a letter of credit "takes on a life of its own," endowing the transaction with the simplicity and certainty that are its hallmarks.   *Alaska Textile Co., Inc. v. Chase Manhattan Bank, N.A.,* 982 F.2d 813, 815-16 (2nd Cir. 1992).   The independence principle is universally viewed as essential to the proper functioning of letters of credit and to their particular value. *Centrifugal Casting Mach. Co., Inc. v. American Bank & Trust Co.,* 966 F.2d 1348, 1352 (10th Cir. 1992).   The independence principle is embodied in Articles 3 and 4 of the UCP 600. *ACE American Ins. Co. v. Bank of the Ozarks,* 2012 WL 3240239 at *5 (S.D.N.Y. 2012).   As well, Article 5 of the UCC expressly provides that an issuer is not responsible for the performance or nonperformance of the underlying contract, arrangement, or transaction, or for any act or omission of others.   UCC § 5-108(f).   If a letter of credit contains

14

nondocumentary conditions, the issuer is authorized to disregard them and treat them as if they were not stated.  UCC § 5-108(g).

It is customary in the construction industry for the owner to retain a percentage (often 10%) of the payments due the contractor to secure the contractor's satisfactory performance of the contract and as a hedge against the risk that the contractor will fail to pay its subcontractors, suppliers and laborers.  *In re James,* 78 B.R. 159, 160 (Bankr.E.D.Tenn. 1987); *Town & Country Bank of Springfield v. James M. Canfield Contracting Co.,* 55 Ill.App.3d 91, 370 N.E.2d 630 (Ill.App. 4 Dist. 1977).  It is not uncommon for a contractor to be permitted to substitute a letter of credit in lieu of retainage.  *See, e.g., In re Enron Corp.,* 370 B.R. 583 (Bankr.S.D.N.Y. 2007); *In re Lancaster Steel Co.,* 284 B.R. 152 (S.D.Fla. 2002); *In re Northeast Biofuels, LP,* 2009 WL 2873073 (Bankr.N.D.N.Y. 2009) (EPC agreement gave Lurgi the option to post an irrevocable standby letter of credit in lieu of 10% retainage).

## ANALYSIS

In his Complaint, the Trustee alleges that the Defendants, as "general counsel" to the Debtor, owed it a duty to determine the effect that the filing of bankruptcy would have upon the Debtor's right to call the letters of credit and to counsel the Debtor regarding necessary actions to be taken to preserve its right to collect the sums payable to the Debtor pursuant to those letters of credit.[4]  It is the Trustee's position that a letter of credit is a "financial accommodation" which is neither assumable nor assignable under section 365(c)(2) of the Bankruptcy Code.  Based upon that premise, the Trustee alleges that the

---

[4]By their denial of the duty, the Defendants have placed the scope of their representation at issue.  A plaintiff in a legal malpractice claim bears the burden to prove that omitted advice was within the scope of representation as a matter of contract.  *F.D.I.C. v. Mahajan,* 2012 WL 3061852 (N.D.Ill. 2012); *Terry v. Woller,* 2010 WL 5069699 (C.D.Ill. 2010).  The presence of other counsel representing the Debtor calls into question the allocation of responsibility among the various attorneys.

Defendants failed to make that determination and failed to advise Smith, or the directors, that the letters of credit could not be called by the Debtor after the bankruptcy petition was filed.  Alternatively, should the Trustee's position regarding the nature of the letters of credit be mistaken, he alleges that the Defendants, after the filing of the bankruptcy, failed to call upon or cause the Debtor to call upon the letters of credit prior to December 15, 2007. The Trustee also alleges that there was a failure of communication between the Defendants and Barash regarding the letters of credit.

The Defendants, without conceding any of the triable issues of fact as to their alleged malpractice, filed this motion for summary judgment solely on the issue of proximate causation.  As to the element of causation, the Defendants contend that the Trustee cannot prove this element because the Debtor's right to draw on the letters of credit was not affected in any adverse way by the bankruptcy filing.  Relying on section 5-113 of Revised Article 3 of the New York UCC, the Defendants contend that upon the filing of a chapter 11 petition, letters of credit are transferred to a debtor in possession by operation of law.[5] The Defendants also theorize that the letters of credit and the EPC Agreements constituted a single, indivisible contract for purposes of section 365.  Considered together as one executory contract they argue, it could not be considered a contract to extend "financial accommodations" within the meaning of section 365(c)(2), because the extension of credit was not the contract's primary purpose, but only incidental to the construction contracts. *See In re United Airlines, Inc.*, 368 F.3d 720, 724 (7th Cir. 2004); *In re Thomas B. Hamilton Co.,*

---

[5]Pursuant to this same provision, the Defendants maintain that,  upon conversion of the case to chapter 7, the Trustee had the right to present the letters of credit for payment.

*Inc.*, 969 F.2d 1013 (11th Cir. 1992).

In response, the Trustee rejects the Defendants' reliance on section 5-113 of Revised Article 3, viewing that provision as being in direct conflict with section 365(c)(2) and relying on the preemptive effect of the Bankruptcy Code. The Bankruptcy Code overrides state law where there is an unavoidable conflict and the two statutes cannot co-exist. *In re Guido*, 344 B.R. 193 (Bankr.D.Mass. 2006)(citing *Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608, 610 (1st Cir. 1995)). It is clear from the alternative allegation of the Trustee's complaint, that he too believes that if the letters of credit are determined not to be contracts of financial accommodation, that they were transferred to the debtor in possession upon the filing of the bankruptcy petition and could have been drawn upon postpetition at least until, according to his theory, December 15, 2007. The Trustee's principal argument, however, is that the letters of credit are separate contracts from the underlying EPC Agreements for assumption purposes, and are "financial accommodations" which the debtor in possession or the Trustee were prohibited from assuming. The Trustee is in part right and in part wrong. A detailed analysis of section 365 is required to address the issue raised by the motion for summary judgment. But the Court will first address the Calyon letters as substituted letters of credit.

### Calyon letters were accepted by Debtor.

The Trustee's continued reliance on the significance of the December 15, 2007 date ignores the substitution of the Calyon letters. By their terms, the Calyon letters of credit went into effect as of November 30, 2007. The Trustee contends that "it is unclear that the substitute letters of credit were accepted by the Debtor." (Doc. 45, par. 9) "Acceptance" by

17

the Debtor is not a condition to the effectiveness of the letters of credit or to Calyon's payment obligation. The letters of credit, on their face, are unconditional and became effective and enforceable upon issuance on November 30, 2007. The Debtor's acceptance of the substitute letters would serve to render the DZ Bank and Commerzbank letters of credit nugatory. If the Debtor did not accept the Calyon letters as substitutes, the DZ Bank and Commerzbank letters would have remained in effect according to their terms meaning any draw demand must have been delivered by December 15, 2007.

The Trustee relies upon the fact that the attorneys (Sidley Austin) for the Debtor and for Lurgi were exchanging emails as late as December 5, 2007, regarding the correction of certain wording and an incorrect date stated in the Calyon letters. The December 5, 2007 email from the Sidley Austin attorney states that "we are okay with exchanging the current LC's for the Calyon LC's in their current form, so long as we receive written confirmation that your client will" cause the corrections to be made. This email supports the conclusion that the Debtor eventually accepted the Calyon letters as substitute letters of credit that served to extend the termination date by one year to December 15, 2008. Although the record does not contain the "written confirmation" referred to in the email, its omission is not sufficient to create a genuine dispute as to the fact of the Debtor's acceptance, since all of the circumstantial evidence in the record supports the inference that the Calyon letters were "accepted" by the Debtor as substitute letters of credit. As indicated by the foregoing recitation of bankruptcy case pleadings pertaining to the EPC Agreements and the letters of credit, the Calyon letters were dealt with by the parties and their attorneys as the

18

effective and operative letters of credit at all times during the bankruptcy case.

The Trustee offers no evidence, and in fact makes no affirmative allegation, that the Calyon letters were rejected by the Debtor. Summary judgment is the "put up or shut up" moment in litigation, where the non-moving party is required to marshal and present evidence in support of his theory of relief. *Goodman v. Nat. Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). Conclusory allegations or denials, unsupported by specific facts, do not suffice. *Payne v. Pauley,* 337 F.3d 767, 772-73 (7th Cir. 2003).

The Calyon letters of credit by their terms became effective upon issuance on November 30, 2007. Viewing the record in the light most favorable to the Trustee, the most that can be said is that the Debtor's "acceptance" of the Calyon letters occurred on or after December 5, 2007. But despite the delay, all of the circumstantial evidence supports the finding that the Calyon letters were accepted as substitutes for and served the same purpose as the original letters. Since the Calyon letters extended the termination date to December 15, 2008, the Trustee's reliance upon the termination date of December 15, 2007, as set forth in the original letters, is unfounded.

***Letter of credit is independent undertaking.***

The Trustee is correct that the letters of credit are independent of the EPC Agreements. This conclusion follows necessarily from the function of letters of credit in commercial transactions. A letter of credit is issued pursuant to a contract between the issuer and its applicant for the purpose of satisfying or securing a separate contractual obligation owed by the applicant to its counterparty, who becomes the beneficiary of the

19

letter of credit.  The applicant pays a fee to the issuer, usually a bank, in exchange for the

issuer's commitment to pay a sum certain to the beneficiary upon demand.  By issuing a

letter of credit, the issuer provides a form of credit or financial accommodation to its

applicant, which, if drawn upon, triggers the applicant's liability to reimburse the issuer.

Thus, the issuer extends credit to and accommodates its applicant, not the beneficiary who

incurs no repayment liability and owes no obligation whatsoever to the issuer.[6]

As is universally recognized, a letter of credit has utility and value in a commercial

transaction precisely because it evidences an "on demand" payment obligation that is

unconditional and independent of the status of the contractual relationship between the

applicant and the beneficiary.  *See In re Northeast Biofuels, LP,* 2009 WL 2873073

(Bankr.N.D.N.Y. 2009) (issuer's payment obligation under letter of credit is totally

independent of the underlying transaction, citing *KMW Intern. v. Chase Manhattan Bank,*

*N.A.,* 606 F.2d 10, 15 (2nd Cir. 1979)).  The doctrine of independence is designed to make

the issuer's payment obligation immune from disputes between the beneficiary and the

issuer's applicant.

The independence principle is embodied in the terms of the irrevocable standby

letters of credit issued by Calyon as of November 30, 2007, providing that draws are

payable on demand to the Debtor, to be debited to the account of Lurgi.  As discussed

above, the independence principle is embodied as well in the UCP 600, to which the Calyon

---

[6]Thirty years ago, Bankruptcy Judge Calvin Ashland correctly made the point that a letter of credit is a financial
accommodation extended from the issuer to its applicant.  *In re Swift Aire Lines, Inc.,* 20 B.R. 286, 287 (Bankr.C.D.Cal.
1982), *rev'd on other grounds,* 30 B.R. 490 (9th Cir.BAP 1983).  *See* discussion *infra* at 25-27.

letters of credit, by their terms, are expressly made subject.  The independence principle is part and parcel of letters of credit in general, and of the Calyon letters of credit in particular.  Accordingly, the Calyon letters are properly analyzed for purposes of section 365 as independent, stand-alone obligations, entirely divorced from the EPC Agreements.[7]

### Letter of credit is not a contract of the Debtor.

Section 365 applies to "any executory contract . . . of the debtor."  The interpretation of the term "executory" is the focus of most of the disputes involving the scope of the section.  The prefatory issue, however, is whether the document in question is a contract of the debtor.  *In re Columbia Gas System, Inc.*, 50 F.3d 233 (3rd Cir. 1995).

A letter of credit satisfies a condition contained in an agreement between the applicant and the beneficiary.  The terms and conditions of the issuance of a letter of credit are set forth in an agreement between the issuer and its applicant.[8]  But there is no bargain between the issuer and the beneficiary.  The issuer undertakes an obligation to pay money to the beneficiary, but the beneficiary passes no value to the issuer, makes no promise to the issuer, and incurs no duty of performance to the issuer.

---

[7]Because the letters of credit are not contracts of the debtor, common law principles applied to the issue of whether multiple related contracts should be construed together are inapposite.  Nevertheless, the rule in New York is that the standard for determining whether two contracts are separable, is the intent of the parties as manifested in the documents, viewed in light of the surrounding circumstances. *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 13, 280 N.E.2d 867 (N.Y. 1972); *131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 921 N.Y.S.2d 94 (N.Y.A.D. 2 Dept. 2011).  Even under this standard, the letters of credit, clearly intended to be enforceable as independent third-party payment obligations, are separable from the EPC Agreements.

[8]The construction and enforcement of the agreement between the issuer and its applicant, including the terms of reimbursement, are governed by traditional contract law.  *Generale Bank v. Czarnikow-Rionda Sugar Trading, Inc.*, 47 F.Supp.2d 477 (S.D.N.Y. 1999).

As variously characterized, a letter of credit is a "unique commercial instrument,"[9]

an engagement,[10] and an "absolute undertaking."[11] One thing it is not is a contract. As

the court in *In re Montgomery Ward, LLC*, 292 B.R. 49, 54 (Bankr.D.Del. 2003), explained,

> [L]etters of credit are not contracts. A letter of credit does not oblige the
> seller/beneficiary to do anything as a bilateral contract would require. If it
> did, then the issuing bank would have a cause of action against the
> beneficiary if it failed to submit the documents to draw on the letter of credit.
> Article 5 of the U.C.C. contemplates no such remedy. Rather, a letter of
> credit is a mode of payment, an "undertaking" by a lender.[12]

Mutuality of obligation is the hallmark of a bilateral contract. *Jarka Corp. v. Hellenic*

*Lines, Ltd.,* 182 F.2d 916, 918 (2nd Cir. 1950); *Consolidated Laboratories, Inc. v. Shandon*

*Scientific Co.,* 413 F.2d 208, 212-13 (7th Cir. 1969). In the case of a unilateral contract, an

offer is accepted by actual performance. *Ardito v. City of Providence,* 263 F.Supp.2d 358, 366

(D.R.I. 2003). Without consideration from the Debtor, either value given or an obligation

promised to Calyon, the letters of credit cannot be contracts of the Debtor. By issuing a

letter of credit, the issuer does not make a contract with the beneficiary, it fulfills a

contractual obligation to its applicant. *Moog World Trade Corp. v. Bancomer, S.A.,* 90 F.3d

1382, 1386 (8th Cir. 1996). "Letter of credit" is defined in Article 5 of the Uniform

Commercial Code as "a definite undertaking" by an issuer to a beneficiary for the account

of an applicant to honor a documentary presentation by payment. UCC § 5-102(a)(10). By

---

[9]*Nassar v. Florida Fleet Sales, Inc.*, 79 F.Supp.2d 284 (S.D.N.Y. 1999).

[10]*Bouzo v. Citibank, N.A.*, 96 F.3d 51 (2nd Cir. 1996).

[11]*Krakauer v. Chapman*, 16 A.D. 115, 45 N.Y.S. 127 (N.Y.A.D. 2 Dept. 1897).

[12]The "unwashed" characterize the letter of credit as a contract between the beneficiary and the issuer, but it is better
to call it an "undertaking" and so avoid the implication that contract principles might apply to it. 3 James J. White &
Robert S. Summers, *Uniform Commercial Code*, § 26-2, at 113 (4th ed.1995).

this definition, a letter of credit is not a contract. *Data General Corp., Inc. v. Citizens Nat. Bank of Fairfield,* 502 F.Supp. 776, 784 (D.Conn. 1980).

### Letter of credit is not executory.

Apart from whether a letter of credit is a contract, it is certainly not executory. In determining whether a contract is executory for the purposes of section 365 of the Bankruptcy Code, nearly all courts employ the definition developed by Harvard Law Professor Vern Countryman in 1973. Under that definition, an "executory" contract is a contract under which the obligations of both the debtor and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other. *In re Streets & Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir. 1989). Both parties to the contract must have significant unperformed obligations. *Dick ex rel. Amended Hilbert Residence Maintenance Trust v. Conseco, Inc.*, 458 F.3d 573 (7th Cir. 2006). The "executoriness" of a contract is determined as of the petition date. *In re Columbia Gas System Inc.*, 50 F.3d 233, 240 (3rd Cir. 1995).

Unless both parties have unperformed obligations, a contract cannot be executory under section 365. *In re Exide Technologies,* 607 F.3d 957, 962 (3rd Cir. 2010). In cases where one party has fully performed and owes no further obligation, the concepts of assumption and rejection serve no purpose. *Columbia Gas,* 50 F.3d at 239. If the debtor's counterparty has fully performed, it simply holds a claim against the estate, so rejection would be meaningless and assumption would be of no benefit to the estate, serving only to convert the claim into a first priority expense. *Id.* Likewise, if the debtor has no unperformed obligations, the performance owed by the counterparty is an asset in the nature of a claim

for performance that may be enforced for the benefit of the estate without first being "assumed." Rejection would equate to a pointless abandonment of valuable property of the estate. *Id.*

Although it is not a contract at all, where a debtor is the beneficiary of a letter of credit, the debtor has no unperformed obligations but is owed an obligation (payment) by the obligor (the issuer). Since no performance is owed by the debtor, the letter of credit is not executory and does not have to be assumed in order to be drawn upon. Here again, the fact that a draw has implications that are governed by the debtor's agreement with the issuer's applicant is immaterial to the question of whether the letter of credit is itself "executory." It is not.

### Letter of credit is not a financial accommodation for the Debtor.

Section 365(c)(2) prohibits the assumption of an executory contract if it is "a contract to make a loan, or extend other debt financing or  financial accommodations, to or for the benefit of the debtor . . . ."[13] Although the term "financial accommodation" is not defined in the Bankruptcy Code, it has been judicially defined as the extension of money or credit to accommodate another. *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1018-19 (11th Cir. 1992). This definition is discerned in part from the legislative history of this provision.[14] While the legislative history of this provision has not been regarded as

---

[13]The court in *In re Maxon Engineering Services, Inc.*, 324 B.R. 429, 432 (Bankr.D.Puerto Rico 2005) makes the point that "[s]ince the financial accommodation described in § 365 is a kind of executory contract, if a contract is not executory, it follows that the contract is not a financial accommodation."

[14]The legislative history states that the purpose of the exclusion "is to make it clear that a party to a transaction which is based upon the financial strength of a debtor should not be required to extend new credit to the debtor whether in the form of loans, lease financing or the purchase or discount of notes." Senate Rep. No. 95-989, 95th Cong., 2nd Sess. 58-59 (1978), reprinted in 1978 U.S. Code, Cong. & Admin. News 5844-45.

entirely clear as to the letter of credit issue before the Court here, it has been consistently recognized that the purpose underlying this provision is to prevent a prepetition creditor from being forced to provide new, postpetition financing to a debtor. *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372 (Bankr.D.Del. 2011); *In re TS Industries, Inc.*, 117 B.R. 682 (Bankr.D.Utah 1990) (purpose of section 365(c) is to prevent a creditor from being required to involuntarily finance a debtor-in-possession's reorganization effort based on a contract that it negotiated without knowing that the debtor would be filing bankruptcy); *In re Placid Oil Co.*, 72 B.R. 135 (Bankr.N.D.Tex. 1987) (prohibition against assumption of contracts for "financial accommodation protects party who has made a "yet unperformed lending commitment"). The exemption from assumption has been construed as limited to agreements entered into before the filing of the petition which extend financing to debtors either as the primary borrower or as a guarantor. *In re Boscov's Inc.*, 2008 WL 4975882 (Bankr.D.Del. 2008). The term "financial accommodation" is strictly construed. *Hamilton*, 969 F.2d at 1018; *In re Twin City Power Equipment, Inc.*, 308 B.R. 898 (Bankr.C.D.Ill. 2004).

As discussed above, the issuer of a letter of credit is providing a financial accommodation to its customer, the applicant for the letter and the party who is liable to pay amounts drawn. The letter is issued on the basis of the applicant's credit and ability to pay. The beneficiary's financial standing is not a factor since the beneficiary incurs no repayment liability to the issuer. Where the beneficiary is the party in bankruptcy, a letter of credit is not a contract to extend financial accommodations "to or for the benefit of the debtor," under section 365(c)(2).

The Trustee relies on *In re Swift Aire Lines, Inc.*, 30 B.R. 490 (9th Cir.BAP 1983), a case

involving similar facts, characterizing it as the only court to have ruled on this issue.  In

*Swift Aire,* the court held that a letter of credit payable to a debtor who subsequently filed

a chapter 7 petition, was an executory contract to extend financial accommodations that

could not be drawn upon by the trustee despite the applicant's contractual agreement that

the letter of credit could be drawn upon even if the debtor filed bankruptcy.  The court's

disregard of the underlying contract was based on its view of the strict compliance

principle in letter of credit law.  The court ruled that the issuer rightfully refused the

trustee's payment demand given the condition of the letter of credit requiring a statement

by the corporate secretary of the debtor.  Alternatively, the court addressed the argument

that the letter of credit was a financial accommodation that could not be assumed and

assigned.  The court determined that the following legislative history was dispositive:

> Subsection (c) prohibits the trustee from assuming or assigning a
> contract or lease if applicable nonbankruptcy law excuses the other party
> from performance to someone other than the debtor, unless the other party
> consents.  This prohibition applies only in the situation in which applicable
> law excuses the other party from performance independent of any restrictive
> language in the contract or lease itself.  The purpose of this subsection, at
> least in part, is to prevent the trustee from requiring new advances of money
> or other property.  The section permits the trustee to continue to use and pay
> for property already advanced, but is not designed to permit the trustee to
> demand new loans or additional transfers or property under lease commit-
> ments.
> Thus, under this provision, contracts such as loan commitments and
> letters of credit are nonassignable, and may not be assumed by the trustee.

House Report No. 95-595 p. 348.

By its plain terms, section 365(c)(2) may only apply to (1) a contract of the debtor,

(2) that is executory, and (3) that extends credit or financial accommodations to or for the

benefit of the debtor.  A standby letter of credit of the kind issued by Calyon meets none

of those three conditions. Since the statutory provision is unambiguous, resort to legislative history as a tool of construction is not proper. *Exxon Mobil Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 567-68, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005); *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.,* 872 F.2d 208, 212-13 (7th Cir. 1989). Legislative history should be used to resolve ambiguity, not create it. *Miller v. Commissioner,* 836 F.2d 1274, 1283 (10th Cir. 1988).

Even if the legislative history is properly consulted, the *Swift Aire* court's conclusion that "[t]he drafters of the Bankruptcy Code considered that letters of credit were executory contracts to make a financial accommodation to or for the benefit of the debtor," 30 B.R. at 496, is, in this Court's view, far too broad. That interpretation fixates on the legislative history's reference to "letters of credit" without giving proper regard to whether it is the issuer's applicant or the beneficiary who is the debtor in bankruptcy, and to the language and purpose of the statute. The fundamental error of the court lies in its failure to recognize the function of the letter of credit in the underlying transaction. While a letter of credit may be viewed as a financial accommodation for the benefit of the applicant for the letter of credit, it is not a "financial accommodation" for the benefit of the beneficiary. Taking *Swift Aire's* analysis one step further, the result of a debtor or trustee drawing on the letter of credit is not to create a debtor/creditor relationship between the debtor and the issuer of the letter of credit, but to cause the issuer to look to the applicant for payment. The Calyon letters of credit were issued to meet an obligation owed by Lurgi and were based upon the financial strength of Lurgi, not of the Debtor. This Court disagrees with *Swift Aire's* reasoning and application of section 365(c)(2).

In sum, the Court concludes that the Calyon letters of credit are not financial

accommodation contracts and that section 365(c)(2), not applicable to a letter of credit
where the beneficiary files for bankruptcy relief, did not bar the Debtor acting as debtor in
possession or the Trustee from drawing upon the letters of credit.[15]

*Right to draw upon letter of credit is property of the estate that may be used by debtor in
possession*.

As instructed by Sidley Austin, on November 30, 2007, Mike Smith sent Lurgi notice
of an intent to draw upon the original letters because of Lurgi's wrongful termination of
the EPC Agreements.  Although the issuance of replacement letters by Calyon cured one
of Lurgi's defaults – the nonrenewal of the original letters of credit – Lurgi's wrongful
termination of the EPC Agreements was uncured, thus providing grounds for the Debtor
to draw upon the Calyon letters of credit.  Whether Lurgi's termination of the EPC
Agreements was actually "wrongful," determinable with certainty only by a court or an
arbitrator, is of no moment.  A declaration by the Debtor that Lurgi acted wrongfully, by
itself would have been sufficient to obtain payment on the letters of credit.  The Debtor, as
beneficiary of the Calyon letters of credit, had a lawful right, by presenting such a
certificate and a request for payment to Calyon, to receive payment from Calyon.[16]  When

---

[15]The Defendants' alternative argument is that the Trustee is judicially estopped from contending that the letters of
credit could not be transferred.  The issue of whether section 365(c)(2) precluded the transferability of the letters of
credit was raised early on in the Debtor's bankruptcy, before conversion of the case to chapter 7 and the appointment
of a trustee.  Because Lurgi, as the sole objector to the Debtor's motion for assumption and assignment of the letters
of credit, eventually withdrew that objection, the issue was never decided by the Court.  In fact, the order entered by
the Court which authorized the transfer of the EPC Agreements and the related letters of credit,  recognized the
uncertain effect of section 365(c)(2) upon the transaction.   The doctrine of judicial estoppel does not apply where a
previously asserted and allegedly inconsistent position was not judicially accepted.  *Perry v. Blum*, 629 F.3d 1 (1st Cir.
2010).  Putting aside the Trustee's role in advocating the transferability of the letters of credit, there was neither any
judicial acceptance or rejection of any position on that issue by this Court.

[16]That the Debtor and Lurgi may have been engaged in an ongoing negotiation, in addition to the formal arbitration
proceeding, during the period of time before and after the bankruptcy filing, does not affect the determination of the
Debtor's rights against Calyon.  There is no evidence of a "stand-still" agreement and no claim that such an agreement
would have affected Calyon's absolute liability.  In any event, the Trustee's cause of action presumes the Debtor's right
to draw upon the letters of credit.

the Debtor filed its chapter 11 petition on December 13, 2007, the right to draw upon the Calyon letters of credit became property of the estate pursuant to section 541(a)(1).[17]  As the Debtor was authorized to operate as a debtor in possession, it had the power and authority to use the property of the estate in the ordinary course of business without notice or hearing.  11 U.S.C. § 363(c)(1).

In their memorandum of law, the Defendants contend that the Trustee cannot prove that they proximately caused the claimed damages.   The Defendants support this contention by arguing that the letters of credit remained transferrable and presentable for payment despite the Debtor's bankruptcy filing.  They rely upon the positive provisions of Article 5 of the Uniform Commercial Code and the inapplicability of Bankruptcy Code section 365(c)(2).

Relying primarily upon an argument for the applicability of section 365(c)(2), the Trustee does not quarrel with Defendants' contention that the applicable provisions of Article 5 of the UCC, on their face, allow for the assignment of letters of credit after bankruptcy, thus enabling a debtor in possession or trustee to draw upon them.[18]  Article

---

[17]Confusion may be caused by the overbroad statement that a letter of credit is not property of a debtor's bankruptcy estate.  The statement is true when the *applicant* is the debtor in bankruptcy, but not when the debtor is the *beneficiary*. *See Ace American Ins. Co. v. Bank of the Ozarks,* 2012 WL 3240239 at *6 (S.D.N.Y. 2012).  More precisely, it is the right to demand and receive payment that becomes property of the estate.  The Calyon letters evidence, but do not themselves constitute that right.  Calyon's offices are located in Paris, and the letters permit a draw demand to be made by delivery of the certificate and demand for payment by telecopier.  Presentation and surrender of the original letters of credit is not required.

[18]While it may be largely a matter of semantics, whether a chapter 11 filing effects a "transfer" of assets and property interests from the debtor to the debtor in possession is an open question.  Because a debtor in possession is, in fact, the same person or entity as the debtor, entitled to deal with its assets and enforce its property and contract rights in its own name, there is no reasoned basis for most bankruptcy purposes to consider a filing to have effected a transfer to a new or different person or entity.  *N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (for purposes of section 365, it is "sensible to view the debtor-in-possession as the same "entity" which existed before the filing of the bankruptcy petition"); *In re James Cable Partners, L.P.,* 154 B.R. 813, 815 (M.D.Ga. 1993) (while debtor in possession acquires all rights and assets of debtor, these rights are acquired without an assignment as no real transfer occurs); *Matter of GP Exp. Airlines, Inc.,* 200 B.R. 222, 232 (Bankr.D.Neb. 1996) (under section 541, debtor's contractual rights are property of the estate which, under section 363, may be used by the debtor in possession).  *See, also,* 11 U.S.C. § 1101(1) ("debtor in possession" means debtor).

5 defines "successor of a beneficiary" to include a debtor in possession and a trustee in

bankruptcy.  UCC § 5-102(a)(15).  A successor of a beneficiary is authorized to sign and

present documents and receive payment in the name of the beneficiary with or without

disclosing its status as a successor.  UCC § 5-113(a) and (b).

**No proximate cause.**

Based on these UCC provisions plus the inapplicability of section 365(c)(2), the

Defendants contend that the Debtor, serving as debtor in possession as of December 13,

2007, until conversion on August 4, 2008, and the chapter 7 trustee thereafter, had the

authority and could have obtained payment from Calyon.  Therefore, say the Defendants,

their alleged failure to advise the Debtor of the purported need to draw on the letters of

credit before bankruptcy or by December 15, 2007, could not have been the proximate

cause of any harm to the Debtor.  The Court agrees.

Having determined that the Calyon letters of credit, for purposes of section 365(c)(2),

were not contracts of the Debtor, were not executory, and did not evidence an extension

of credit or financial accommodation to the Debtor, it follows directly that section 365(c)(2)

is not applicable.  Therefore, the Trustee's primary cause of action, premised entirely on

the applicability of that provision, is defeated.

The second allegation of malpractice in the Complaint is whether, in the event that

the Court determines that the letters of credit are not covered by section 365(c)(2), the

Defendants breached their duty by failing to call upon or cause the debtor in possession

to call upon the letters of credit prior to December 15, 2007.  The Court has now determined

that the Calyon letters replaced the original letters of credit.  Thus the December 15, 2007

date has no significance as the Calyon letters extended the termination date for an additional year to December 15, 2008. The Trustee's second cause of action cannot stand either, since the Debtor had the right to draw upon the Calyon letters after filing bankruptcy and after December 15, 2007. Any failure of the Defendants to advise the Debtor to draw upon the letters on or prior to December 15, 2007, could not have been the proximate cause of any harm to the estate.

The third claim alleged in the complaint is that the Defendants negligently failed to make Barash aware of the existence of the letters of credit and the Debtor's right to draw upon them. There is no direct evidence in the record of when Barash first learned of the letters of credit. However, he filed a motion on January 7, 2008, that referred to the letters of credit. On January 28, 2008, Barash filed an exhibit to the Debtor's statement of financial affairs, which in paragraph 10 addresses the Debtor's long-term debt and letters of credit, stating that the collateral of Credit Suisse includes all letters of credit issued to the Debtor.[19] It is clear that Barash was aware of the letters of credit early in the bankruptcy case, no later than January 7, 2008. Since the bankruptcy filing did not affect the Debtor's right to draw upon the letters, even if the Defendants breached a duty by failing to make Barash aware of the letters, that breach could not have been the proximate cause of any harm to the Debtors.

The motion for summary judgment will be granted.

## JURISDICTION

The Court previously issued an Opinion determining that the cause of action for

---

[19]The existence of a lien on the Debtor's right to payment under the letters of credit would go a long way toward explaining why the letters were not drawn upon, since those rights and the proceeds would have constituted "cash collateral" under section 363(a). So the decision not to draw upon the letters may well have been made by Credit Suisse.

legal malpractice against the Defendants did not arise in or arise under the Debtor's bankruptcy case and was not a core proceeding, but indicating an intent to reevaluate the jurisdictional basis as the case progressed.  The Court now determines that this adversary proceeding raises claims "arising under" Title 11, which include rights determined by a statutory provision of Title 11.  *See In re Repository Technologies, Inc.,* 601 F.3d 710, 719 (7th Cir. 2010).  The Court determines that this matter is a core proceeding, both statutory and constitutional, under 28 U.S.C. § 157(b)(2)(O).  A final judgment may be entered that is appealable to the district court.  28 U.S.C. § 157(b)(1).

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate Order will be entered.

### ###